# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br>vs.<br><br>LEEANN HILL,<br><br>       Defendant. | FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER<br><br>Case No. 2:13CR704 DAK |

   This matter is before the court on a Motion to Suppress filed by Defendant Leeann Hill. An evidentiary hearing on the motion was held on June 2, 2014. After briefing by the parties, the court heard closing arguments on July 29, 2013. At the hearings, Defendant was represented by Michael J. Langford. The United States was represented by Vernon G. Stejskal. Since taking the motion under advisement, the court has further considered the law and facts relating to this motion. Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT

   After obtaining a Title III wiretap on the phones of Francisco Romero-Barajas ("Mr. Romero") and Julio Cesar Perez-Vargas ("Mr. Perez") for suspected drug distribution activity, Utah DEA agents began to intercept the telephone calls of these men beginning on August 21, 2013 and continuing through October 1, 2013. Transcript of Evidentiary Hearing on Motion to Suppress Evidence, June 2, 2014, pages 8, 11. (Hereinafter "Tr. at ___.") From these intercepted calls, Agents became aware of one of Mr. Romero's and Mr. Perez's customers

known as "the lady" or "the old lady." Tr. at 11 and 33. Agents intercepted call #594 on September 16, 2013 during which Mr. Romero and Mr. Perez discussed the difficulty Mr. Romero was having in locating and delivering a quantity of methamphetamine to a female customer who was driving a truck. Tr. at 12-15. Although Agents did not have direct surveillance of this particular interaction, they learned that the drug customer was a woman driving a truck. Tr. at 14-15. They suspected that this meeting between the "old lady" and Mr. Romero was likely supposed to have occurred at the Iron Horse apartment complex. Tr. at 21.

On call #722, intercepted on September 25, 2013 at 6:03 p.m., Agents learned that the old lady had made a telephone call to Mr. Perez and was again ready to meet with Mr. Romero to purchase a quantity of methamphetamine. Agents learned from that call that the lady had called to get more meth after just over a week, rather than the usual two-week period. (*See* Government's Exhibit 2); Tr. at 16-18. At 6:11 p.m., Agents intercepted another pertinent call on the same phone number ending in 0068, which was Mr. Perez's number. Tr. at 12, 19. Agents learned that Mr. Romero was going to meet with the lady in a couple of hours to supply her with additional methamphetamine. Tr. at 19-20.

In order to further investigate the matter, Agents set up surveillance in several locations in Park City, including Mr. Romero's apartment complex, at the storage unit used by Mr. Romero on previous drug transactions, and at the Iron Horse apartment complex, where they suspected that last meeting was supposed to have occurred (and which was located less than a mile from Mr. Romero's apartment off of Kearns Boulevard in Park City). Tr. at 20-21. Surveillance was also established on Kearns Boulevard for takeaways, or routes away from the storage unit. Investigators had obtained a ping order (i.e., a GPS location) on the phone they suspected "the

2

lady" was using, and they determined that the phone was hitting off of cell towers in the Fruitland area, east of Fruitland off of Highway 40. They therefore knew the lady lived east on Highway 40 on the way to Duchesne. Tr. at 21.

Up to this point in the investigation, Agents still lacked the lady's identification, her name, and the make and model of her truck. Tr. at 21. On September 25, 2013, at approximately 7:35 p.m., surveillance officers observed Mr. Romero exit his apartment complex and get in a red pickup truck. Two minutes later, at 7:37 p.m. Officer Wetzel observed a white Ford pickup truck with two female occupants pull into the Iron Horse apartment complex. Officer Wetzel reported his records check of license plate, which came back registered in Duchesne County. *Id*. The pickup was registered in Duchesne County to Leeann Hill. Due to the registration location (Duchesne County), and given where the cell phone calls were hitting towers, the surveillance officers were fairly certain that the owner of the truck was Mr. Romero's female customer, the "old lady." Tr. at 22-23.

At approximately 7:39 p.m., Agent Street testified that he watched Mr. Romero's red truck arrive at the storage unit via a law enforcement-installed video camera. Tr. at 23. Mr. Romero then exited the vehicle and went into the storage unit. After a brief time, Mr. Romero returned from the storage unit carrying something concealed under a jacket draped over his arm. Mr. Romero then returned to his red truck and departed from the scene, heading in the direction of the Iron Horse apartments. *Id*. Mr. Romero's behavior was similar to his behavior that had been observed on previous controlled buys in which substances were seized and confirmed to be methamphetamine. Tr. at 24.

A few minutes later, Agent Wetzel saw Mr. Romero arrive at the Iron Horse apartment

complex in his red truck. Mr. Romero drove past the white truck and then parked approximately fifty yards east of the white truck. Tr. at 24-25. Rather than walking straight to the white truck, Mr. Romero walked into the apartment complex, exited through the center of the complex, and approached the passenger side of the white truck. Tr. at 25. There, Agent Wetzel observed a female exit the passenger side of the truck. Mr. Romero then approached the passenger door and either leaned in through the window or entered the passenger side of the truck briefly. Fewer than two minutes later, Mr. Romero departed from the white truck and walked away. The woman got back into the passenger side of the white truck and also left the scene. Tr. at 26. Surveillance continued on the white truck, which headed east on Kearns Boulevard toward Highway 40. The white truck then got on Highway 40 headed eastbound toward Heber and Duchesne. Tr. at 26-27. The surveillance team called out the location, the description of suspects, the description of cars over the radio so that the rest of the surveillance team could track what's happening and be up to speed. Tr. at 27.

On that same date, September 25, 2013, at approximately 8:00 p.m., Deputy Mark Reid Ahlberg ("Deputy Ahlberg") was working traffic enforcement eastbound on Highway 40. Tr. at 30-31. DEA Task Force Officer Nguyen ("TFO Nguyen") had called him earlier that evening, at approximately 6:00 p.m., asking him to be on standby on Highway 40, watching eastbound traffic. Tr. at 55. At approximately 8:00 p.m., Deputy Ahlberg received a call from TFO Nguyen, who was following the white truck, asking him to make a traffic stop on a white, Ford pickup truck heading eastbound on Highway 40. Tr. at 31. TFO Nguyen also informed Deputy Ahlberg that it was possible that the occupants in the vehicle had been involved in a drug deal in Summit County. Tr. at 31. TFO Nguyen requested, however, that Deputy Ahlberg make an

4

independent traffic stop. Tr. at 31.

Deputy Ahlberg was stationed at milepost 13 on Highway 40 facing eastbound when the indicated white truck passed him. He followed the truck and caught up to it at milepost 14, where he determined that the truck's rear wheels were not properly covered by a mud flap pursuant to Utah Code Ann. 1953 § 41-6a-1633 (West 2014). Tr. at 31-32.

Deputy Ahlberg also knew that the truck was the correct one because he ran the license plate number and confirmed with TFO Nguyen that it was the vehicle of interest. Deputy Ahlberg pulled the Defendant over at milepost 15 ½ on Highway 40. Tr. at 33. When he approached them, he asked the driver for her license, registration and insurance first, and then explained that he had stopped her for no mud flaps on her vehicle. Tr. at 34. Officer Ahlberg noted that the driver and her passenger were very talkative and seemed cheerful, but they were both smoking, which, to him, was a sign of nervousness because "generally people don't light up in a traffic stop unless there is some amount of nervousness." Tr. at 49-50.

The driver was identified as Leeann Hill, and the passenger on the right side was identified as Cassandra Anderson. *Id.* After he received her documents, he advised Mrs. Hill that he was working traffic that night, and that he also worked a narcotic detector dog, and he was going to run the dog around her vehicle.[1] Tr. at 36. He then asked her if there were any controlled substances or paraphernalia in the vehicle, and she responded "no." Deputy Ahlberg went back to his vehicle and got his service dog out of the back and put a leash on her He then deployed his dog, starting at the left corner of the front bumper and going in a counterclockwise

---

[1] By the time Defendant had provided her relevant documents, Deputy Nguyen had arrived. Tr. at 36.

5

direction. Tr. at 37. When the dog began to sniff at the left front wheel well, the dog alerted to an odor of narcotics coming from the vehicle. Tr. at 37. As he proceeded down the side of the vehicle, the dog sniffed the bottom door seam of the driver's door with focused, intense sniffing, trying to pinpoint the source of an odor. The dog also sniffed the rocker panel with focused, intense sniffing, and she even put her head under the vehicle to try to pinpoint an odor. Tr. at 37.

Both the dog and Deputy Ahlberg were certified in narcotics detection for the period including the date of the stop of the Defendant. Tr. at 37-38. The officer had been working with this dog for seven years. *Id*. Deputy Ahlberg testified that the dog alerted on the exterior of Defendant's vehicle. Tr. at 40. After finishing the deployment on the exterior of the vehicle, Deputy Ahlberg secured the dog back in his truck, and asked Ms. Hill to step out of the vehicle. He explained to her that his dog alerted on her door, and it was trying to pinpoint the odor of an illegal controlled substance. He asked her if he could search the vehicle, and hesitated and responded that "no, there's nothing in it." Tr. at 40-41. He then explained to her that due to the alerts the dog exhibited, he had probable cause to search her vehicle. Deputy Nguyen was at the passenger side door with Ms. Anderson, and he had her step out. When they were both out of the vehicle, Deputy Ahlberg deployed his canine on an interior sniff of the vehicle. Tr. at 41. Fria alerted on several areas of the interior. Officer Nguyen then searched the vehicle, and after a short period of time, discovered two pounds of methamphetamine. Tr. at 42.

## CONCLUSIONS OF LAW

A traffic stop is proper where an officer has either "probable cause to believe a traffic violation has occurred" or a "reasonable articulable suspicion" that a driver has violated a traffic regulation. *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir.2009). To have a reasonable

articulable suspicion, an officer must have "some minimal level of objective justification for making the stop." *Id*. (internal quotation marks omitted). The officer's subjective motivation for the stop is irrelevant to the determination of reasonableness under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 810–13 (1996); *see also U.S. v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011) (a traffic stop is justifiable even when the officer's primary reason for the conducting the stop is to investigate drug trafficking). In determining the reasonableness of a traffic stop the court must determine whether the traffic stop was, (1) justified at its inception, and (2) reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Cash*, 733 F.3d 1264, 1273 (10th Cir. 2013) (internal quotations omitted). Here, the stop was justified at its inception because Deputy Ahlberg saw that the Defendant's truck was in violation of Utah's mud-flap law and ultimately cited Defendant for not having proper mud flaps.

The court also finds that the stop was reasonably related in scope to the circumstances that justified the stop. After receiving Defendant's license and registration, but before he returned to his vehicle to write the citation, Deputy Ahlberg informed Defendant that he was going to take his canine around the exterior of the car to do a narcotic sniff. The canine was already present in Deputy Ahlberg's vehicle, and the exterior deployment took a matter of minutes. Deputy Ahlberg and the canine were both certified during the period that included September 25, 2013, and Defendant has not raised an issue about the canine's certification or reliability.

Also, the court finds that the exterior canine sniff did not unreasonably prolong the traffic stop. At the time of the canine sniff, Deputy Ahlberg had not yet returned to his car to write up

7

the citation and had not returned Defendant's license and other documents to her. Thus, the purpose of the initial stop had not yet been completed. While the precise length of time it took to deploy the dog is not in the record, it is clear from the testimony that the traffic stop was prolonged by only two to three minutes–the time it took for Deputy Ahlberg to walk to his truck, secure his dog on a leash and walk it around the vehicle.

An officer is permitted to "inquir[e] into matters unrelated to the justification for the traffic stop," *see Arizona v. Johnson*, 555 U.S. 323, 333 (2009), and he may take other actions that do not constitute "searches" within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle's exterior. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009). Indeed, at least one court has found that dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only *de minimis* intrusions of the defendant's Fourth Amendment rights. *See United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006).[2]

In this case, after the dog alerted on the exterior of Defendant's vehicle, Deputy Ahlberg had probable cause to search Defendant's vehicle. It is well-settled law in the Tenth Circuit that an alert by a trained drug-detecting dog, without more, provides law enforcement officers with probable cause to search the vehicle. *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993); *United States v. Ludwig*, 641 F.3d 1243, 1250-51 (10th Cir. 2011); *see also United States*

---

[2] Alternatively, the court finds that because of Deputy Ahlberg's knowledge of a possible drug transaction from TFO Nguyen, along with his perception that the driver and her passenger seemed nervous because they were both smoking, he had reasonable suspicion that would justify the exterior canine search.

*v. Carbajal-Iriate*, 586 F.3d 795, 803 (10th Cir. 2009) ("dog's positive alert to the drugs in the van provided probable cause"). Once probable cause is found, the entire vehicle may be searched including containers and its contents. *U.S. v. Ross*, 456 U.S. 798, 799 (1982).

As a separate and independent basis for denying Defendant's motion to suppress, the court finds that the traffic stop and exterior canine sniff were constitutional under the collective knowledge doctrine, under which law enforcement officers may rely on a bulletin or alert to conduct a stop. *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008). In other words, the knowledge and reasonably suspicions of one officer can be imputed to another. *See United States v. Whitley*, 680 F.3d 1227, 1233 (10th Cir. 2012). "An arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action." *Id*.

Here, TFO Nguyen testified that the whole surveillance team was communicating with each other, calling out the location, the description of suspects, the description of cars over the radio so that the rest of the surveillance team could track what's happening and be up to speed. TFO Nguyen had asked Deputy Ahlberg earlier that evening to be on standby on Highway 40, and after the surveillance team witnessed events that transpired that evening and saw the white truck heading eastbound on Highway 40, TFO Nguyen asked Deputy Ahlberg to stop the white truck. While he asked Deputy Ahlberg to find an independent reason for the traffic stop, he also stated that it was possible that the occupants in the vehicle had been involved in a drug deal in Summit County. The court finds that regardless of how TFO Nguyen characterized the reason for the stop to Deputy Ahlberg, TFO Nguyen had reasonable suspicion of illegal drug activity to make the stop and to conduct an exterior canine search of Defendant's vehicle.

9

Accordingly, there was no violation of Defendant's Fourth Amendment rights, and her Motion to Suppress is denied.

**ORDER**

Based on the above reasoning, IT IS HEREBY ORDERED that Defendant's Motion to Suppress [Docket #907] is DENIED.

DATED this 27th day of August, 2014.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge